# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF TENNESSEE
# AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ) | | |
| upon the relation and for the use of the ) | | |
| TENNESSEE VALLEY AUTHORITY ) | | |
| Plaintiff ) | | |
| ) | | |
| v ) | NO: 2:07-CV-142 | |
| ) | | |
| EASEMENTS AND RIGHTS-OF-WAY ) | | |
| OVER A TOTAL OF 3.92 ACRES OF ) | | |
| LAND, MORE OR LESS, IN GREENE ) | | |
| COUNTY, TENNESSEE ) | | |
| ) | | |
| CAROLE COBBLE, *ET VIR* ) | | |
| Defendants ) | | |

## MEMORANDUM OPINION AND ORDER

On June 21, 2007, the United States of America upon the relation and for the use of the Tennessee Valley Authority ("TVA") filed this federal condemnation action pursuant to Title 40 United States Code sections 3114 through 3118 and Title 16 United States Code sections 831 through 831ee. Jurisdiction, which is pursuant to Title 16 United States Code section 831x, and venue are not in dispute. The matter was tried before this Court on May 18 through 20, 2010, and the only issue for this Court to decide is the just compensation for the easements and rights-of-way acquired by the plaintiff. The easements and rights-of-way totaled 3.92 acres of a 64.5 acre tract of land (the "property") in Greene County, Tennessee owned by defendants Carole Cobble and C.M. Cobble (the

"Cobbles").

More specifically, the easements and rights-of-way were acquired for the erection, operation, and maintenance of electric transmission and communication circuits. The easement rights are limited, and the easements do not restrict access to or along the rights-of-way. They also do not deprive the defendants of their use of the land within and adjacent to the rights-of-way as long as the purposes are not inconsistent with plaintiff's limited rights.

The plaintiff acquired the rights-of-way in two separate tracts, Tract No. JSTUP-14 and Tract 16. Tract No. JSTUP-14 is the "eastern right-of-way," and it contains 2.64 acres and is approximately 100 feet in width and 952 feet in length. In addition, there is one three-pole transmission line structure with guy wires that is located in the right-of-way. Tract 16, the "western right-of-way," contains 1.28 acres. It is approximately 100 feet in width and 553 feet in length. The plaintiff not only acquired easement rights outside of the rights-of-way to dispose of trees which, if they fell, could fall within five feet of the transmission line circuits or structures, but the plaintiff also acquired rights to install guy wires for supporting the three-pole structure outside the eastern right-of-way.

The Cobbles acquired the 64.5 acres in separate deeds over several years. As stated, the property is located in Greene County, Tennessee, and it is northeast of Greeneville, Tennessee. Because of this location, the property has potential for future

residential development. The property is located near a municipal water tank, factories, mobile homes, subdivisions, and rural residential properties. Also, the property is irregularly-shaped, and it fronts Snapps Ferry Road and Quillen Shell Road.[1] In addition, it contains rental houses and the Cobbles' son's property. The Cobbles' son is named Jason Cobble, and the 4.5 acres on which he lives was referred to at trial as "Jason's house."[2] None of the houses are impacted by the rights-of-way. At the time of the taking, the portions of the property not used for residential purposes were used for agricultural purposes.

The topography of the property is such that several acres are higher in elevation. From this area, one can see expansive views of the Unaka Mountain Range. The eastern right-of-way is located on this upper area. The area of land directly below this upper acreage is steeply sloped and covered by brush and woods. Because of this topography, neither the transmission line and structures nor the Unaka Range can be seen from all portions of the property.

At trial, four witnesses testified as to the amount of just compensation. Those witnesses included C.M. Cobble, one of the property owners, and Shane Carter ("Carter"),

---

[1] The property has approximately 1000 feet of frontage on Snapps Ferry Road and approximately 620 feet of frontage on Quillen Shell Road. There is also a right-of-way access easement to Plainview Circle on the property's northeastern boundary.

[2] The parties stipulated that "[a]n area of about 4.5 acres of the Cobble property is occupied by their son Jason Cobble, who has built a residence on the property. However, Jason Cobble has stipulated that he has no claims in this case and it is further stipulated that the proper parties have been joined."

Nancy Point ("Point"), and Michael Green ("Green"), who testified as expert valuation witnesses. Cobble, Carter and Point testified in the defendants' case in chief, and Green was the sole appraisal witness for the plaintiff. The defendants called William Miller ("Miller") and Leon Bird ("Bird") in rebuttal; however, neither rebuttal witness offered an opinion as to the amount of just compensation. In sum, the just compensation opinion testimony was as follows:

> (1) Cobble testified that the before-acquisition value of the property was $300,000.00, and there was a $200,000.00 diminution in value as a result of the taking;
>
> (2) Point testified that the before-acquisition value of the property was $940,000.00, and there was a $140,000.00 diminution in value as a result of the taking;
>
> (3) Carter testified that the before-acquisition value of four separate parcels, which comprised 23.75 acres of the property, was $285,000.00, there was a $178.257.31 diminution in value to these parcels as a result of the taking, and there was no incidental damage to the remainder of the property not affected by the easement and rights-of-way; and
>
> (4) Green testified that the before-acquisition value of the property was $309,000.00, and there was a $70,000.00 diminution in value as a result of the taking.[3]

The Fifth Amendment guarantees "just compensation" for private property

---

[3]This Court notes that Green stated in this report that the highest and best use of the property as of the date of the taking was a close question as to whether it was for residential, mini-farm development or for agricultural use. His testimony at trial, however, focused mainly and almost solely upon residential, mini-farm development.

taken for public use. U.S. Const. amend. V. "Just compensation for condemned property is that amount of money necessary to put a landowner in as good a pecuniary position, but no better, as he would have been in if his property had not been taken." *United States v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 341 (6th Cir. 1993). To determine this amount, the owner is entitled to the "fair market value" of the property taken. *United States v. 103.38 Acres of Land*, 660 F.2d 208, 211 (6th Cir. 1981). "'Fair market value' is to be determined from 'what a willing buyer would pay in cash to a willing seller.'" *Id.* (quoting *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473-74 (1973)).

In addition, just compensation "is measured by the highest and best use of the land–that use which would bring the highest price. . . . The highest and best use of the property can be based upon reasonable future probability; however, 'speculative and remote possibilities cannot become a guide for the ascertainment of value,' especially when the creation of such a potential use would require a substantial investment of capital." *L.E. Cooke*, 991 F.2d at 341 (quoting *United States v. 1,291.83 Acres of Land*, 411 F.2d 1081, 1083 (6th Cir.1969)). Also, "[a] 'comparable sales' analysis has long been and remains the preferred method of establishing a property's 'fair market value.'" *103.38 Acres of Land*, 660 F.2d at 211; *see, e. g. United States v. 2,847.58 Acres of Land*, 529 F.2d 682 (6th Cir. 1976); *Welch v. Tennessee Valley Authority*, 108 F.2d 95 (6th Cir. 1939), *cert. denied*, 309 U.S. 688 (1940).

5

Furthermore, the burden of proof as to just compensation is on the defendants. *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 273-74 (1943); *United States ex rel. TVA v. 137 Acres of Land, Etc.*, 406 F.2d 1283, 1287 (6th Cir. 1969). The value of the rights taken is determined as of the date of the taking. *United States v. Dow*, 357 U.S. 17, 18-25 (1958). In this case, that date is June 21, 2007. The measure of just compensation when an easement is taken "is the difference between the fair market value of the property before and after the taking." *United States ex rel. TVA v. An Easement and Right of Way 150 Feet Wide and 582.4 Feet Long Over Certain Land in DeKalb County, Tenn.*, 182 F.Supp. 899, 902 (M.D. Tenn. 1960) (citing *Olson v. United States*, 292 U.S. 246 (1934)). "It is also proper for the witnesses to arrive at their estimate of just compensation by valuing the area covered by the easement immediately before and after the taking plus any incidental damages, if any, to the remainder of the property outside the easement area."[4] *Id.* at 903. The fee value of the land within the rights-of-way is not allowed because it is treated as a partial taking since only limited rights were taken. *Id.* at 902.

Cobble testified that he had experience buying and selling real estate,

---

[4]The plaintiff argues that Carter's method of evaluating parcels affected by the easement not in relation to the property as a whole was improper. This matter was raised before the United States Magistrate Judge in a motion in limine, and the magistrate judge determined that Carter's opinion testimony was admissible. The plaintiff did not appeal this Order. Further, this Court notes that the plaintiff's own expert did not offer his opinion in relation to the entire property as a whole. Green's appraisal excluded the valuation of the rental houses and the area referred to as "Jason's house."

although he was not an experienced licensed real estate broker or appraiser. He offered his opinion as to his property's value before and after the taking. His testimony regarding the diminution in value at trial differed significantly from his testimony at a pre-trial deposition and was, as defendants acknowledge, "somewhat confusing." Although the landowner is permitted to offer an opinion on the value of his property, the opinion cannot be based on subjective personal value, and is only one element to be considered in determining fair-market value at the time of taking. *United States v. 79.20 Acres of Land, etc.*, 710 F.2d 1352, 1357 (8th Cir. 1983). The owner's testimony does not change the market value concept the court must apply in determining just compensation. *See United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966).

Point, a certified general appraiser from Rogersville, Tennessee, testified that the highest and best use of the property was residential, mini-farm development. She divided the property into 3 to 10 acre tracts and evaluated comparable sales. Point's comparable sales used to determine pre-taking value range from $13694 to $9115 per acre and she determined a pre-acquisition value of $14,244 per acre or a total value of $940,000. In determining after-acquisition value, Point opined that the property could not be subdivided and would have to be sold as a single tract. Her comparable sales used to determine after-acquisition value ranged from $5875 to $6649 per acre and she determined an after-acquisition value of $800,000.

Carter, an auctioneer and a licensed residential appraiser from Greeneville,

Tennessee, based his opinions as to value on several hypothetical subdivision tracts he designed which contained a total of 23.75 acres. Initially, Carter created three proposed tracts on the highest portions of the property near the transmission line route and designated these tracts as A (11.74 acres), B (8.60 acres) and C (1.71 acres). Later, Carter added a fourth tract, tract F, which contains 1.70 acres. Carter testified that the before-acquisition value of these four separate parcels, comprising 23.75 acres of the property, was $285,000. He did not assign a value to the remainder of the property and did not determine that the remainder of the property was damaged in any way by the taking.

Carter based his determinations of value on comparable sales. Carter determined that the value of the two tracts located in the northeast elevations of the property had decreased from $105,000 to $36,000 for the 11.74 acre tract and from $100,000 to $27,000 for the 8.76 acre tract. This represented a 67 percent and a 73 percent reduction in value respectively. Carter opines that the value of the 1.71 acre tract, located at a lower elevation, had been diminished from $40,000 to $15,000 or 62.5 percent. As to the fourth 1.70 acre tract, which Carter did not formally appraise, Carter found damage only to the area in the right-of-way amounting to $11,257.23 using the same valuation method he used for the 1.71 acre tract, for a 28 percent reduction in value if the same $40,000 pre-acquisition value is assigned to the 1.70 tract as Carter assigned to the 1.71 acre tract. Based on these calculations, Carter determined that just compensation due for the four tracts was $178,257.31.

Green, a certified general appraiser from Johnson City, Tennessee and a Member of the Appraisal Institute, testified that the highest and best use of the property was either agricultural or as a development tract for mini-farm lots. Green considered the division of the subject property into many farm lots ranging in size from 4.5 to 22 acres, based on a conceptual division[5] of the property. Green also stated opinions as to value based on comparable sales. Green determine the before-acquisition fair market value of the property was $309,000, based on a before easement value of $487,500 and deduction of approximately $180,000 in estimated development costs. Based on Green's conceptual division of the property, and using comparable sales for comparison, he determined the after easement value of the total tract to be $362,600, which he reduced by the costs of development, resulting in a total after easement value of $239,000, or a $70,000 total diminution in value.

As noted above, both Miller and Bird were called as rebuttal witnesses by the landowners. Miller, a Johnson City, Tennessee licensed appraiser with 35 years experience as an appraiser, reviewed the method of division proposed by Green and offered his opinion as to the propriety of the division proposed. He did not testify on the issue of value. Miller's testimony was that Green's proposed method of division was not practical to divide the property to obtain fair market value. He further opined that the property could be subdivided into mini-farm tracts with limited development costs. He

---

[5] Green's report refers to his division of the property as "solely for illustrative purposes."

specifically testified that it would not be necessary for $180,000 in expenditures to subdivide and sell the property. While Miller did not give any specific estimate of the costs of development of the property, he did testify that costs would be minimal.

Bird, who oversees Greene County's building and zoning office, testified about the building and zoning regulations in Greene County. Although Bird's testimony was at times confusing, he ultimately testified that, conceptually speaking, Green's division could be approved by the Greene County Planning Commission so long as the two upland lots designed by Green had 50 feet of access to Snapps Ferry Road. Bird did not give an opinion as to whether or not Green's proposed points of access to Snapps Ferry Road over steep, rough terrain were practical. Carter, however, was also called as a rebuttal witness and it was his opinion that the 50 foot access conceptualized by Green to the two northernmost tracts was not practical and that, in his experience, purchasers of those tracts would require that the tracts be designed to allow a purchaser to drive on his own driveway.

While expert opinions as to the before and after-taking value of property are helpful to the Court in determining just compensation, expert opinions on damages are advisory only. Those opinions must be weighed together with all of the evidence of record and should never be blindly accepted. *See Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1943). And, as plaintiff acknowledges, expert or opinion testimony is only as good as the facts and assumptions upon which that testimony is based, and, if

such testimony is without support in the evidentiary and/or physical facts or in the law, such testimony may be disregarded. *See Instructions to Commissioners*, 61 F.R.D. 503, 507 (Instructions given in *United States, ex rel and for the use of Tennessee Valley Authority v. Two Tracts of Land Containing 211 Acres, More or Less, in Monroe County, Tennessee*, U.S.D.C., E.D. Tenn., No. 7496 (1973)).

Not surprisingly, each party to this litigation vigorously attacks both the methodology and underlying data used by the appraiser(s) relied upon by the opposing party. For instance, the plaintiff claims that the comparable sales used by Point were not comparable to the subject property because they were located south of Greeneville, a considerable distance from the property, were located much closer to the Unaka Mountain range and had views not comparable to the property, and included at least one tract of riverfront property. Further, plaintiff argues that Point assumed damage to the property based on the impact of actual transmission lines but did no actual evaluation as to that issue. Plaintiff attacks Point's opinions as not fully supported by adequate explanation and/or data and plaintiff cites to some internal conflicts in Point's report regarding the valuation. As a result of all these things, plaintiff argues that Point's opinions as to value are not persuasive.

Plaintiff attacks the testimony of Carter on grounds of his inexperience as an expert appraisal witness and his purported lack of knowledge of recognized appraisal standards. Plaintiff vigorously attacks Carter's methodology in appraising only a portion

of the subject property, his lack of personal inspection of the properties used by him as comparables, and plaintiff criticizes Carter because he did not give consideration to the costs and negative effects of his hypothetical subdivision. As with Point, plaintiff argues that the comparable sales utilized by Carter were not comparable to the subject property for many of the same reasons put forth in criticism of Point. As a result of these alleged deficiencies, plaintiff argues that Carter's opinions are likewise not persuasive.

On the other hand, the landowners level similar criticism of Green. They vigorously attack Green's conceptual division of the property, including the design of those tracts in terms of size, typography and suitable road frontage for the purchase of driveways by prospective purchasers. The landowners also contrast Green's testimony as to development costs with the contradictory testimony offered by Carter, Point , and Miller. The landowners also claim that the comparable sales used by Green in his evaluation of the subject property were in reality not comparable to the subject property. They also attack Green's opinion that appraisal of the property was essentially the same regardless of whether or not the property was used for agricultural purposes or for residential development purposes. In comparing the testimony of Green with the testimony of Carter, the landowners state that "Green is by far the one more skilled in the forensic arena. However, Mr. Carter is the one that showed he knew what he was talking about."

Although the Court finds the opinions given by all of the expert witnesses in

this case to be helpful to the Court in determining just compensation for the taking at issue in this case, the Court does not find the testimony of any of the expert appraisal witnesses to be entirely persuasive. Neither the methodology employed by Green nor the methodology employed by Carter with respect to a division of the property is completely persuasive. Green's division was "conceptual" only and he acknowledged that he had done no subdividing in Greene County. On the other hand, Carter's proposed subdivision appears to have been designed based on the location of the transmission lines, a consideration that would not be appropriate in determining the before-taking value of the property. Carter's failure to formally appraise the 1.70 acre tract and his failure to arrive at a before and after value of the entire acreage is also troubling.

And, while the Court acknowledges that inquiry as to comparable sales yields the best indication of value of property, there was wide disagreement among these appraisal experts as to the appropriate comparable sales to be used. In reality, that fact simply underscores that real estate appraisal is not an exact science and that considerable judgment on the part of the individual appraiser enters into the evaluation process. Otherwise, three well qualified appraisers would not reach such divergent opinions as to value. As a result of these factors, the Court will take into account the opinions of all of the experts who testified in the case but will not completely credit any particular expert, relying instead on the Court's evaluation of the entire record in the case.

Based on the testimony and the applicable law, the Court FINDS the

following:

(1) As of the date of the taking, June 21, 2007, the highest and best use of the subject property was interim agricultural use with future use for residential, mini-farm development;

(2) The before-taking value of the property is determined by use of the sales comparison approach of mini-farm lots;

(3) The highest elevated 20 acres of the property provided the greatest per acre contributory value before the taking;

(4) The lower 44.5 of the property provided the least per acre contributory value before the taking;

(5) The 4.5 acres and house occupied by Jason Cobble are not impacted by the taking;

(6) The eastern right-of-way crosses the upland 20 acres in such a way as to significantly devalue the entire upland 20 acres as a result of the taking;

(7) The western right-of-way crosses the lower 44.5 acres in such a way as to devalue only a portion of that area as a result of the taking; and

(8) Beyond the upper 20 acres and the portion of the lower 44.5 acres, the remaining acres have not been damaged or impacted as a result of the taking.

        The specific values will now be discussed in terms of the specific evidence and testimony admitted at trial. All experts agreed that before the taking, the highest and best use of the land was for residential, mini-farm development. Based on the testimony,

expert reports, and topographical maps, this Court concludes that the upper 20 acres had a before-taking value of $13,000.00 per acre for a total value of $260,000.00. None of the experts divided the property in the same way; however, they all agreed that the views from the upper acres of the property caused that property to be worth more. The manner in which the property is divided is not dispositive of the issue. To reach this before-taking valuation determination, the Court has relied heavily upon three comparable sales used by Green, those being his comparable sale numbers 3, 4, and 5.

The lower portions of the property, which do not afford the extensive mountain views like the upper portion, were worth less.[6] To determine this value, the Court has relied heavily upon Green's comparable sale numbers 3 through 7. This Court concludes that the lower acres of the property had a pre-taking worth $6,700.00 per acre. This Court will subtract the 4.5 acres for "Jason's house" from the lower 44.5 acres because neither Green nor Carter included this in their assessment. Furthermore, the parties stipulated that this house and acreage were not affected by the easements. Thus, this Court FINDS that the lower portion of the property had a pre-taking value of $268,000.00. Accordingly, the 60 acres had a total pre-easement worth of $528,000.00.

As to any adjustments, only Green testified that this value should be

---

[6]Of course, the three valuation experts chose different approaches. Nancy Point applied comparable sales to the entire property, Carter used comparable sales for only the areas affected by the easement (before and after the taking), and Green used different comparable sales for different portions of the property.

diminished because of development costs, including legal fees, survey costs, road construction, utilities, sales commission, marketing, and developer's profit. The others, including defendants' rebuttal witness Miller, testified that development costs for the property would not be significant and would not affect the market value of the property. This Court has considered such costs in its determination of value, and after considering the testimony and these costs, this Court credits the testimony of Carter, Point and Miller and will not make such deductions, finding that they would be minimal and would not affect the value of the property.

After the taking, the experts disagree about several aspects of the property. Point determined that the land could not be subdivided and it would have to be sold as a single tract. Based on comparable sales, she determined that this significantly devalued the entire property. Carter opined that after the taking, the property's highest and best use changed from development to agricultural use because the easement took away not only the prime building sites but all building sites. He then used comparable sales for "rough" properties to determine the after-taking value. Green first opined that the highest and best use of the upper acreage after the taking was not precluded; however, his opinion changed somewhat at trial. Because the easements took away the prime building spots, Green believed that the upper acreage should now be sold as one lot for a recreational residence such as a hunting cabin. The eastern right-of-way impacted the upper acreage's utility and left it with only one possible building site. Green then used comparable sales to determine

its value. As to the western right-of-way, Green determined that the highest and best use would be the same, as well as the same utility. He conducted a detailed analysis on the effects of powerlines to these types of residences and used comparable sales to determine the diminution in value.

The Court has carefully analyzed these approaches, and as to the upper 20 acres, the Court credits the testimonies of Point and Carter, mainly Carter. This Court FINDS that the highest and best use after the easement is agricultural. The comparables used by Carter, however, are not substantially similar, and this Court determines that this causes the amounts to be somewhat reduced. Thus, considering all the evidence, this Court concludes that the upper 20 acres has diminished in value by 38 percent.

As to the lower 40 acres,[7] this Court credits the testimony of Green. Even Carter agrees that the lower area outside of the easement is not affected after the taking. Green's comparable sales and extensive market study on the affects of powerlines is convincing evidence to this Court. Thus, this Court concludes that the diminution in value of the lower 40 acres is 8 percent.

In sum, based upon the evidence and the credited testimony, this Court FINDS that the just compensation due to the defendants is 38 percent of $260,000.00, which equals $98,800.00, and 8 percent of $268,000.00, which equals $21,440.00, for a

---

[7] The Court notes again that neither the Unaka Mountains nor the power lines can be viewed from most of this lower acreage.

total of $120,240.00.[8]

An appropriate judgment will enter.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

---

[8] It is simply by happenstance that the amount of just compensation determined by the Court is roughly mid-way between the amount of just compensation found by Green to be due ($70,000) and the amount determined by Carter ($178,257.31). The Court is very much aware that a mere mathematical average of the highest and lowest appraisals would be improper and an abdication by the Court of its duty to exercise its independent judgment on the issue of just compensation.